### JONES v. SOUTHERN UTAH POWER CO.

No. 6696. Decided July 18, 1944. (150 P. 2d, 376)

See 29 C. J. S. Electricity, Sec. 64. Pleading particular cause of injury as waiver of right to rely on doctrine of res ipsa loquitur, note, 79 A. L. R. 48. See, also, 38 Am. Jur. 960.

483

ARTHUR E. MORETON and ELIAS L. DAY, both of Salt Lake City, and DURHAM MORRIS, of Cedar City, for appellant.

WOODROW D. WHITE, of Salt Lake City, for respondent.

McDONOUGH, Justice.

Plaintiff administratrix, suing on behalf of herself and her children, recovered judgment on a verdict for wrongful death, and defendant appeals. The assigned errors relate to (1) alleged improper instructions to the jury, (2) claim of lack of negligence on the part of the respondent corporation, (3) purported negligence on the part of decedent sufficient to bar recovery as a matter of law, and (4) alleged failure of the complaint to state a cause of action.

A careful examination of the charge to the jury, together with a study of the requests of defendant for certain instructions, disclose that the court gave in substance the major part of the requested instructions. As to the balance of the requests, certain portions may be correct statements of law, but other parts are erroneous, so the trial court did not err in refusing the tender in its entirety of each of the rejected proposals for instructions. An analysis of the charge to the jury as a whole leads to only one conclusion—that the instructions were fair and that defendant could not have been prejudiced thereby.

In order to illustrate our decision on the other three points, we give a synopsis of the evidence and the pleadings.

Sometime prior to the fatal accident which constituted the foundation for this action, Joseph M. Jones (the decedent) and others constructed a small irrigation storage pond on

land adjacent to the public highway in the town of Enoch in Iron County. The Southern Utah Power Company has a transmission line which extends over said pond, constructed some years ago. The transmission wire is of a dull galvanized iron appearance, connected with glass insulators which are fastened to wooden pins inserted into cross-arms near the top of poles 18 feet high. The line runs generally in a north and south direction approximately parallel to the highway, to the pole identified for illustrative purposes as "pole number 3," then the line veers from its north course about 14 degrees to the west, so that poles 2, 3 and 4 form an angle of about 166 degrees. There is a distance of 240 feet between poles 2 and 3. If a line were stretched between poles 2 and 4 it would come above and across the path of a guy wire extending from a telephone pole situated about 55 feet northerly from pole 2. There is a foot path around the rim of the pond, used by those who opened and shut the headgate. The headgate is about 30 feet south of pole 3. Along the east side of the road and to the west and southwest of pole 3 appears a row of four trees which partly obscures the view of pole 3 for a distance of about 150 feet, although the pole may be seen from points both north and south of the trees.

About 7 p. m. on July 17, 1942, the deceased, Joseph M. Jones, left his house about 100 feet from the pond, and went over to the pond apparently to turn off the irrigation stream. There had been a slight rainfall that afternoon. A boy 9 years old saw him walk over to the bank of the pond, singing as he walked and whittling on a stick with his pocketknife. One witness said she heard a bang which sounded like something hit the guy wire or like a shot, followed by a singing noise which she recognized as a sound of an electrical wire. She was not certain as to the exact interval which elapsed between the time she heard the bang and the moment when she came out of the house and heard her 9-year-old boy exclaim while pointing over to the reservoir, "Uncle Joseph fell." She said ten minutes might have elapsed. When she found the deceased, his head was down and his neck against

the wire, and his feet were stretched out toward the footpath. An open pocketknife belonging to the deceased was found near by and a stick which one boy said he had seen the deceased whittling as he walked toward the headgate.

Some children had been swimming in the pond during the afternoon, and several witnesses who said they saw the wire sagging about 4 or 5 feet above the ground after the accident, and wholly disconnected from pole 3, testified that several hours before the accident they knew the wire was not down. There was physical evidence to indicate that the glass insulator to which the wire had been attached some months before, had been completely shattered, and that the tie wire which fastened the wire to the insulator had slipped down onto the wooden pin, and that the pin had gradually burned in two, with the result that the transmission wire fell from the cross-arm. The natural weight of the wire would swing it to the west in the downward plunge because of the angle formed by poles 2, 3 and 4. No one saw the transmission wire strike the guy wire. Whether the wire struck the deceased on the rebound swing, or whether he walked into it from an angle, is not known. The left side of his neck was badly burned. It was admitted by defendant that the deceased met his death from electric shock from contact with the transmission wire.

Plaintiff did not rely wholly on the rule of res ispa loquitur, but proceeded to show that 33 days prior to the fatal event, some adolescent boys shot off the insulator to which the transmission wire in question had been attached to the pin on the cross-arm of pole 3, and that plaintiff was informed of such fact sometime after the accident. Plaintiff introduced evidence to show that decedent was not around when the insulator was shot off and that the ones who caused its destruction did not say anything about it until after the accident. Proof was also proffered and received to the effect that the burning of the pin was gradual.

Following denial of motion for nonsuit, defendant attempted to show that the daughter of decedent was present when

the boys shot off the insulator on June 14, 1942; that decedent came along to turn off the water and told the boys to quit shooting at the insulator. This evidence was offered for the purpose of showing that decedent likely knew of the destruction of the insulator on pole 3 situated on his own property, the defendant contending that decedent had a duty to inform it of such condition and that his failure to do so would preclude recovery by his administratrix. There is some conflict in the testimony as to whether the decedent warned the boys to desist from shooting at the pole before or after the insulator was shot off, but each of the witnesses who testified that something was said by him also stated that he went about his work again.

The evidence is not such that the jury would be required to find that decedent stood by and watched the boys destroy the insulator, or that he gave approval, or that he participated in its destruction, or even that he knew that this particular insulator was being or had been ■ destroyed. The shattering of the insulator did not result in immediate destruction of the pin or the fall of the transmission wire. The attempt of defendant to place on decedent the responsibility for the dropping of the wire from pole 3, did not convince the jury. Though the only evidence introduced on the matter had been that of the defendant, it was not such as to compel the jury to find that he was culpable in any manner for the destruction of the glass insulator, the resultant burning of the pin, or the consequent fall from pole 3 of the live wire which brought about his death.

Nor is there such evidence of contributory negligence on the part of decedent as would preclude recovery as a matter of law. We have scrutinized the testimony of each witness, and we are unable to agree with the contentions of defendant that the evidence is undisputed that dece- ■ dent knew that the insulator had been destroyed or that he was negligent in failing to inform the company of its destruction. He had no duty to make an inspection

of the transmission lines and appurtenances of defendant to make a discovery of defects, nor did he have any duty to ascertain the needs for repair. The evidence which relates to the surrounding circumstances which might indicate that knowledge could have been acquired by decedent as to the destruction of the insulator, is not of such character as to require a finding that he actually knew that the insulator was gone, nor that he was aware of the operation of forces which resulted in burning through the pin and the creation of a situation of grave danger which might cause the wire to fall. There could be no duty to report the destruction of the insulator in any event until he first knew of its destruction; and we cannot say that his training, experience and awareness of the possible consequences of such destruction of the insulator, were such that he as an ordinary reasonably prudent man would be impelled to report to the defendant. Respondent would have the court invade the province of the jury, and convert possibilities into facts.

The complaint states a cause of action. It alleges that the company failed to keep its transmission lines in a proper state of repair, and that the company knew or by the exercise of ordinary care and proper inspection in the operation and maintenance of its lines and connecting facilities and equipment should have known that the wire was insecurely fastened, and that it permitted said wire to become loose and to fall from the pole to the ground, which wire was dangerous in that it was charged with a heavy load of electricity capable of destroying life; and that on July 17, 1942, while said Joseph M. Jones was walking along the path on his premises, he came in contact with said wire which fell across his path, and that he was killed from the electric shock resulting from said contact with said wire. The allegations of negligence are sufficient.

We pass to a consideration of whether there was competent evidence of negligence on the part of defendant to permit recovery. Defendant did not directly refute the testimony

produced by plaintiff to the effect that the insulator
had been shot off 33 days before the fatal accident,
and that slight rainfall moistened the pin so as to cause
burning until it was destroyed in the course of 33 days, and
that a careful inspection of the pole would readily have dis-
closed such defect. In fact, in the attempt to introduce evi-
dence to show that decedent knew about the destruction
of the insulator, defendant offered proof which corroborated
plaintiff's proof that the insulator was shot off 33 days before
the fatal accident. While defendant offered testimony that
there was lightning and thunder during the afternoon of
July 17th, no evidence was offered to show that the insulator
was shattered by lightning a short interval before the
accident nor that lightning was the cause of disconnection
from the pin or the fall of the wire.

Although defendant corroborated the proof that the
destruction of the insulator occurred on June 14, 1942,
it offered proof that it made an inspection of the line several
days prior to the accident by the use of radio and by watch-
ing the line and the insulators, and that no trouble was
detected. That the jury might well have concluded that such
inspection was done in a negligent manner is apparent from
the facts revealed on cross-examination. While one witness
testified that he did not tune in on any program while
making the inspection, the companion on the inspection trip
stated that he was listening to a program, so that the jury
could well conclude that in making the inspection their
attention was not directed to their work. The evidence dis-
closed that the view of pole 3 is partly obscured by trees,
so that the jury could properly conclude that the inspection
was not thorough nor standard, but superficial, particularly
in view of the proof offered by defendant that the insulator
was then gone and the admissions that the line inspectors
did not notice pole 3 any more than any other pole, and
that they drove from 20 to 25 miles per hour. Traveling
at such rate might well preclude any detailed examination
of a power line, its insulators and connections. The de-
fendant's evidence showed that the absence of the insulator

on pole 3 could be detected from the road and by a person riding in an automobile. Its contention that its inspection was done according to accepted standards and rules, was doubtless disbelieved by the jury, and in view of the facts and circumstances, the jury were entitled to reach the conclusion they did reach, and to find as they did find in this case.

The judgment is affirmed, with costs to respondent.

WOLFE C. J., and LARSON, WADE, and TURNER, JJ., concur.